**Dianna M. CATO, Appellee,**

v.

**AMERICAN SUZUKI MOTOR CORPORATION, a California Corporation, Appellant.**

**No. 99–0254.**

Supreme Court of Iowa.

Feb. 14, 2001.

Daniel P. Chesire and Frederick T. Harris of Lamson, Dugan & Murray, Omaha, Nebraska, for appellant.

Philip Willson of Willson & Pechacek, P.L.C., Council Bluffs, and James Polack of Bradford, Coenen and Welsh, Omaha, Nebraska, for appellee.

TERNUS, Justice.

The appellee, Dianna M. Cato, sued the appellant, American Suzuki Motor Corporation, seeking to recover damages under Iowa's Defective Motor Vehicle Act. *See* Iowa Code ch. 322G (1997). After a jury trial, the district court entered judgment for Cato. Suzuki appeals, claiming the trial court erred in denying its motion for summary judgment and its motion for judgment after trial based on the jury's answers to special interrogatories. Alternatively, Suzuki requests a new trial based on error in the court's instructions to the jury. We conclude that the trial court did not err in refusing to enter judgment for Suzuki on its summary judgment motion and after the jury returned its verdict. We also hold, however, that the trial court erred in failing to instruct the jury that Cato was required to give Suzuki written notification of the nonconformity in her car and a final opportunity to repair the nonconformity prior to filing

suit. Accordingly, we reverse and remand for a new trial.

I. *Iowa Code Chapter 322G–Iowa's Lemon Law.*

In order to appreciate the significance of the factual history of this case, it is helpful to review the statutory framework that will guide our consideration of the legal issues. Chapter 322G is entitled "Defective Motor Vehicles"; it is commonly known as a lemon law. The purpose of this statute is to provide a remedy to consumers who purchase a motor vehicle that cannot be brought in compliance with the manufacturer's warranty. *See* Iowa Code § 322G.1. The statute imposes a duty upon manufacturers and their authorized service agents to "make repairs as necessary to conform the vehicle to the warranty," provided the consumer reports the nonconformity to the manufacturer or its authorized service agent "during the lemon law rights period." *Id.* § 322G.3(3); *see also id.* § 322G.2(8) (defining "lemon law rights period"). If the manufacturer or its agent has not repaired or corrected a nonconformity "that substantially impair[s] the motor vehicle after a reasonable number of attempts," the manufacturer must replace or repurchase the vehicle. *Id.* § 322G.4(2).

To assist the consumer in proving that the manufacturer or its agent has had "a reasonable number of attempts" to repair the vehicle, the statute creates a presumption "that a reasonable number of attempts have been undertaken" if one of three sets of circumstances exists during the lemon law rights period. *See id.* § 322G.4(3). One scenario involves a nonconformity "likely to cause death or serious bodily injury." *Id.* § 322G.4(3)(*b*). Cato did not claim that this alternative applied in the present case. Cato did, however, rely on the other two alternatives to obtain the statutory presumption. These alternatives are stated in the statute as follows:

3. It is presumed that a reasonable number of attempts have been undertak-

en to conform a motor vehicle to the warranty if, during the lemon law rights period, any of the following occur:

a. The same nonconformity that substantially impairs the motor vehicle has been subject to examination or repair at least three times by the manufacturer or its authorized service agent, *plus a final attempt by the manufacturer to repair the motor vehicle if undertaken as provided for in subsection 1,* and such nonconformity continues to exist.

. . . .

c. The motor vehicle has been out of service by reason of repair by the manufacturer, or its authorized service agent, of one or more nonconformities that substantially impair the motor vehicle for a cumulative total of thirty or more days, exclusive of down time for routine maintenance prescribed by the owner's manual.

*Id.* § 322G.4(3)(*a*), (*c*) (emphasis added). The final attempt to repair "as provided for in subsection 1" refers to section 322G.4(1), which states:

1. After three attempts have been made to repair the same nonconformity that substantially impairs the motor vehicle, or after one attempt to repair a nonconformity that is likely to cause death or serious bodily injury, the consumer may give written notification, which shall be by certified or registered mail or by overnight service, to the manufacturer of the need to repair the nonconformity in order to allow the manufacturer a final attempt to cure the nonconformity. The manufacturer shall, within ten days after receipt of such notification, notify and provide the consumer with the opportunity to have the vehicle repaired at a reasonably accessible repair facility and after delivery of the vehicle to the designated repair facility by the consumer, the manufacturer shall, within ten days, conform the motor vehicle to the warranty. If the manufacturer fails to notify and provide the consumer with the opportunity to

have the vehicle repaired at a reasonably accessible repair facility or perform the repairs within the time periods prescribed in this subsection, the requirement that the manufacturer be given a final attempt to cure the nonconformity does not apply.

After twenty or more cumulative days when the motor vehicle has been out of service by reason of repair of one or more nonconformities, the consumer may give written notification to the manufacturer which shall be by certified or registered mail or by overnight service. Commencing upon the date such notification is received, the manufacturer has ten cumulative days when the vehicle has been out of service by reason of repair of one or more nonconformities to conform the motor vehicle to the warranty.

*Id.* § 322G.4(1).

In the event the nonconformity is not repaired and the manufacturer refuses to replace or repurchase the vehicle pursuant to section 322G.4(3), the consumer has two potential remedies. First, if the manufacturer has established a certified dispute resolution program, the consumer may file a claim with the program. *See id.* §§ 322G.6–.7. If the consumer is not satisfied with the decision rendered in the certified program or is dissatisfied with the manufacturer's performance as directed in the decision, the consumer may appeal the decision to the district court or ask the court to direct the manufacturer to fulfill the terms of the decision. *See id.* § 322G.8(2), (4). If a decision is not rendered in the certified program within the time frames provided in the statute or if the manufacturer has no certified program, the consumer may file an action in the district court, provided "the consumer has notified the manufacturer pursuant to section 322G.4, subsection 1." *Id.* § 322G.8(1).

With this statutory framework in mind, we now turn to the facts of this case.

## II. *Background Facts and Proceedings.*

On May 30, 1996, Cato leased a new 1996 Suzuki "Sidekick" sport utility vehicle from Rhoden Auto Center, Inc. in Council Bluffs, Iowa. Within a few months, Cato began experiencing difficulties starting the vehicle. Rhoden towed the car to its facility and kept the vehicle for six days, August 2 through August 7, in an attempt to diagnose the problem. The problem could not be duplicated and Rhoden returned the car to Cato without making any repairs.

Cato continued to randomly have problems with the vehicle. She returned the car to Rhoden on September 17, 1996 with a complaint that the "[e]ngine at times will cut out and stall—will re-start but have to keep accelerator depressed and runs rough and cuts out." Rhoden kept the vehicle for four days, but again was unable to duplicate the problem. A third incident occurred on September 30, 1996, when Cato reported to Rhoden that the car "starts and dies at times [and] shakes very bad when starting to die." Although Rhoden could not identify the problem, it decided to replace the idle air control valve. This part, however, was on backorder, resulting in a lengthy delay before the repairs could be completed. During this time, Rhoden provided Cato with a free rental vehicle. The repairs were eventually completed on October 31, thirty–two days after the car had been taken in for repair.

After the valve was replaced, Cato thought the car ran "kind of sluggish," but she considered the vehicle repaired. In June 1997, she exercised her option under the lease to purchase the car.

Problems with the car began to resurface in the fall of 1997. Cato had difficulty starting the vehicle and she experienced problems with the car dying out. These problems generally occurred when the engine was cold, in the morning or after the car had sat for a while. Cato also started to notice a "rubbing noise in the steering

wheel" and a "knocking noise in the front left portion of the car." She returned the vehicle to Rhoden on November 10. Rhoden kept the car for four days in an unsuccessful attempt to diagnose the stalling problem. During this time it lubricated the steering column in an attempt to stop the noise coming from that area.

When similar problems developed on November 18, Cato returned the car to Rhoden, who decided to replace the idle air control valve again. This repair was completed on November 25, 1997. By this time, the car had been in for repairs a total of fifty-four days since Cato acquired the vehicle in May 1996.

Cato spoke with Rhoden about the possibility of obtaining a replacement vehicle under the lemon law. When Rhoden told her this was not possible, Cato sought legal advice. Upon advice of counsel, she sent a letter to Suzuki informing it of "the stalling and other problems with the vehicle such as incessant rattling under the body," and giving Suzuki an opportunity to correct these problems. Suzuki received this letter on January 6, 1998.

The parties dispute what occurred after Suzuki received Cato's letter. Cato testified that she was not contacted by Suzuki until January 19, 1998, when someone left a message on her answering machine. Su-

zuki, on the other hand, presented evidence that Rhoden's service advisor had contacted Cato on Suzuki's behalf on two occasions within ten days of receiving the notice, leaving messages on Cato's answering machine on January 8 and January 13, 1998.

Cato filed this suit on February 4, 1998. She sought damages under Iowa Code chapter 322G. Suzuki answered, claiming, in part, that Cato's suit was premature because she had not given Suzuki an opportunity to cure the alleged nonconformities under Iowa Code section 322G.4(1). Suzuki filed a motion for summary judgment on the basis that as a matter of law the alleged nonconformities had been repaired. The court denied Suzuki's motion.

The case proceeded to trial on November 24, 1998. The parties stipulated that the court would determine damages and attorney fees if the jury found in favor of Cato on liability.

At the close of evidence, the court submitted the liability issue to the jury. The court's instructions told the jury that Cato could recover if she proved the elements of one of two alternative theories; one theory was set out in instruction no. 8 and an alternative theory was set out in instruction no. 9.[1] These instructions were basi-

---

1. These instructions stated:

INSTRUCTION NO. 8
Plaintiff has alleged two theories of recovery but is required to prove only one.
The plaintiff must prove either the necessary elements of this instruction or the necessary elements of Instruction No. 9 on the following page.
In order to prove her case under this Instruction, the plaintiff must prove all of the following propositions:
1. There was a nonconformity in one or more of the following ways:
a. The nonconformity was likely to cause death or serious bodily injury and at least one attempt was made to repair the nonconformity.
b. The nonconformity substantially impaired the fitness, reliability or safety of the vehicle for ordinary use and at least three

attempts were made to repair the nonconformity, and/or
c. The nonconformity substantially impaired the fitness, reliability or safety of the vehicle for ordinary use and the vehicle was out of service twenty (20) or more days during the first two years after delivery for repair of one or more nonconformities.
2. The defendant was given notice of a final attempt to cure the nonconformities.
3. Defendant failed to contact plaintiff within ten days of receiving notice.
4. Defendant American Suzuki has not conformed plaintiff Dianna M. Cato's Suzuki Sidekick to the warranty by repairing the nonconformities.
If the plaintiff has failed to prove any of these propositions, you will consider the following instruction.
INSTRUCTION NO. 9
This Instruction is an alternative theory of recovery to the previous Instruction.

cally patterned after the two statutory presumptions set out in section 322G.4(3). Instruction no. 8 was based on section 322G.4(3)(*a*), which provided for a presumption that the manufacturer had been given a reasonable number of opportunities to repair the vehicle if the car had been in for examination or repair at least three times and the manufacturer had been given a final opportunity to correct the problem, as provided in section 322G.4(1). Instruction no. 9 was based on section 322G.4(3)(*c*), which allowed a presumption if the car had been out of service by reason of repair for "a cumulative total of thirty or more days." The significant difference between the two instructions was the inclusion in instruction no. 8 of the requirement that "[t]he defendant was given notice of a final attempt to cure the nonconformities"; this requirement was omitted in instruction no. 9 over Suzuki's objection.

The case was submitted to the jury on five special interrogatories. Suzuki had requested that the jury answer the following question: "Did plaintiff Dianna Cato provide defendant American Suzuki a final opportunity to cure the alleged nonconformity?" Instead, the court instructed the jury to answer this question: "*If the vehicle was out of service for less than 30 days*, did plaintiff Dianna M. Cato provide defendant American Suzuki a final opportunity to cure the alleged nonconformity?" (Emphasis added.) Suzuki objected to the verdict form and reasserted its request for the verdict form it had submitted to the court. The trial court overruled Suzuki's objections and submitted the case to the jury.

The jury answered the special interrogatories, finding that Cato's vehicle had a nonconformity that substantially impaired the car. The jury also found that Suzuki had been given a reasonable number of opportunities to repair the vehicle, but had not done so. In response to interrogatory no. 5, "If the vehicle was out of service for less than 30 days, did plaintiff Dianna M. Cato provide defendant American Suzuki a final opportunity to cure the alleged nonconformity?" the jury answered "no."

Suzuki requested that the court enter judgment in its favor based on the jury's response to question no. 5, asserting that the jury found that Suzuki did not have a final opportunity to cure and that this finding was fatal to Cato's right to recover. The court ruled that whether Suzuki had a final opportunity to cure was not pertinent to Cato's recovery under instruction no. 9 and that the jury's answers to the first four interrogatories established Suzuki's liability under that instruction. After receiving evidence on damages, the court entered judgment for Cato in the amount of $26,120.70, plus attorney fees. Suzuki appealed. Initially it claims that the trial court erred in failing to enter a judgment in its favor based on the jury's answer to special interrogatory no. 5. Suzuki argues that the jury's answer indicates it found that Cato had not given Suzuki a final opportunity to cure the nonconformities in Cato's vehicle. Therefore, asserts Suzuki, Cato cannot recover under the lemon law as a matter of law. Secondly, Suzuki reasserts its objection to the

Under this Instruction, the plaintiff must prove all of the following propositions:
1. There was a nonconformity in the vehicle.
2. The nonconformity substantially impaired the fitness, reliability or safety of the vehicle for ordinary use and the vehicle was out of service thirty (30) or more days during the first two years after delivery for repair of one or more nonconformities.

3. Defendant American Suzuki has not conformed plaintiff Dianna M. Cato's Suzuki Sidekick to the warranty by repairing the nonconformities within a reasonable number of attempts.
If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to recover.
If the plaintiff has proved all of these propositions, you will consider defendant American Suzuki's affirmative defense explained to you in Instruction No. 11.

trial court's failure to include in instruction no. 9 the requirement that Cato give Suzuki a final opportunity to correct the problems with her car. Suzuki's third alleged error is based on the trial court's denial of its motion for summary judgment. Suzuki asserts that it established as a matter of law that, as of the time of the summary judgment motion, Cato's vehicle had been repaired and was not "substantially impaired" as required by the lemon law. Finally, Suzuki challenges the trial court's calculation of damages and attorney fees. We will start our discussion with the claimed instructional error.

### III. *Was Cato Required to Give Suzuki a Final Opportunity to Correct the Alleged* Nonconformities?

The court instructed the jury in instruction no. 9 that the plaintiff could recover if she proved that the vehicle did not conform to the warranty, that the nonconformity substantially impaired the vehicle, that the car had been out of service for thirty or more days, and that Suzuki had not repaired the vehicle within a reasonable number of attempts.[2] Suzuki contends that Cato was also required to prove that she had complied with section 322G.4(1), which provides for notice to the manufacturer and a final opportunity to remedy the nonconformity. Cato responds that this notice and opportunity are not required if the vehicle has been out of service for repairs for thirty days or more, citing section 322G.4(3). We review this claimed error for correction of errors of law. *See Graber v. City of Ankeny,* 616 N.W.2d 633, 642 (Iowa 2000).

It is important initially to distinguish between the requirements for the statutory presumption that the manufacturer had a reasonable number of attempts to cure

and the statutory prerequisites for a civil action in the district court. *Compare* Iowa Code § 322G.4(3), *with id.* § 322G.8(1). To obtain the statutory presumption, a plaintiff must meet one of three sets of requirements. *See id.* § 322G.4(3). Pertinent to the facts of the present case are two alternatives. Cato had to prove either that the manufacturer or its authorized service agent had made at least three attempts to repair the vehicle plus a final attempt by the manufacturer as provided for in section 322G.4(1), *or* that the vehicle had been out of service for repairs for thirty days or more. *See id.* § 322G.4(3)(*a*), (*c*) (also requiring that the nonconformity "substantially impair the motor vehicle"). Thus, to obtain the statutory presumption when the vehicle has been in for repairs for thirty or more days, Cato did not have to show that she had given notice to the manufacturer of a final opportunity to cure the nonconformity. *See id.* § 322G.4(3)(*c*).

In contrast, section 322G.8(1) sets forth the prerequisites for bringing a civil suit in district court. It provides that the consumer may commence an action *if* "the consumer has notified the manufacturer pursuant to section 322G.4, subsection 1," in other words, if the consumer has given the manufacturer a final opportunity to cure as provided in section 322G.4(1). The necessity of giving the section 322G.4(1) notice before filing suit, as established by section 322G.8(1), is not dependent on the number of days that the vehicle has been out of service; this prerequisite applies in all cases. Therefore, the trial court should have instructed the jury that Cato was required to prove her compliance with section 322G.4(1) in order to recover.

---

**2.** We are not aware of a requirement that the vehicle be out of service for a particular length of time as a prerequisite to *recovery* under chapter 322G, as opposed to being simply a prerequisite for the statutory presumption that the manufacturer had a reasonable number of opportunities to repair the noncon-

formity. In any event, neither party objected to the inclusion of this requirement as an element of the plaintiff's claim, rather than being contained in a separate instruction identifying the requirements for the statutory presumption.

This error requires that we reverse the judgment in favor of Cato and remand for a new trial. Suzuki argues, nonetheless, that a new trial is not necessary because the jury's answer to interrogatory no. 5 reflects a finding that the required opportunity to cure was not given to the manufacturer. We now consider that argument.

## IV. Did the Trial Court Err in Failing to Enter Judgment in Favor of Suzuki Based on the Jury's Answer to Interrogatory No. 5?

■ After the jury's verdict, Suzuki argued that it was entitled to judgment in its favor because the jury found that Cato had not given it a final opportunity to cure the nonconformities. This argument rests on the jury's negative answer to the following interrogatory: "If the vehicle was out of service for less than 30 days, did plaintiff Dianna M. Cato provide defendant American Suzuki a final opportunity to cure the alleged nonconformity?"

Pursuant to the instructions contained in the special interrogatories, the jury was required to answer this question regardless of whether it made a preliminary finding that the vehicle was out of service for less than thirty days. Thus, it is unclear when the jury answered "no" to this interrogatory whether its answer was based on a finding that the vehicle was *not* out of service for less than thirty days, or was based on a finding that the plaintiff did not give the defendant a final opportunity to cure. Therefore, we cannot say with any certainty that the jury in fact made a finding that Cato did not give Suzuki a final opportunity to correct the nonconformity.[3]

■ Suzuki argues that as a matter of law the vehicle was out of service for less than thirty days and, therefore, the jury's response must have been based on a finding that Suzuki did not have a final chance to repair the vehicle. Suzuki's argument rests on the contention that the "lemon law rights period" commenced upon Cato's *purchase* of the vehicle in 1997 and, therefore, the forty-two days on which the vehicle was in for repairs during the time Cato *leased* the vehicle cannot be counted. Suzuki also claims that the statutory definition of a "consumer" prevents Cato from tacking together the periods during which she was a lessee and a purchaser. We find these arguments unconvincing.

The statute defines "lemon law rights period" as

> the term of the manufacturer's written warranty, the period ending two years after the date of the original delivery of a motor vehicle to a consumer, or the first twenty-four thousand miles of operation attributable to a consumer, whichever expires first.

*Id.* § 322G.2(8). The applicable alternative in the present case is "the period ending two years after the date of the *original delivery* of a motor vehicle to *a consumer.*" *Id.* (emphasis added). The parties dispute the date upon which delivery occurred. Cato argues the vehicle was delivered on May 30, 1996, when she first leased the car. Suzuki contends that when Cato elected to purchase the vehicle in June 1997, a new delivery occurred and any attempts to repair the vehicle and any out-of-service days prior to that date did not occur within the new lemon law rights

---

**3.** Suzuki contends that Cato waived any argument that the special interrogatory was confusing because she did not object to the question. This contention misses the mark. Cato does not predicate error on the special interrogatory so as to trigger error preservation requirements. Rather, Suzuki bases its request for judgment in its favor on the ground that the jury's answer to interrogatory no. 5 reflects a finding that Cato did not give Suzuki a final opportunity to cure. Therefore, it is incumbent on Suzuki to convince the court that this finding is inherent in the jury's answer. Whether Cato objected to the interrogatory has little to do with whether the jury's answer can be interpreted in the way Suzuki proposes.

period. We disagree with Suzuki's interpretation of the statute.

> Chapter 322G defines a "consumer" as the purchaser or lessee, other than for purposes of lease or resale, of a new or previously untitled motor vehicle, or any other person entitled by the terms of the warranty to enforce the obligations of the warranty during the duration of the lemon law rights period.

*Id.* § 322G.2(3). Under this definition, Cato was "a consumer" when she leased the vehicle in May 1996. Therefore, the lemon law rights period commenced on May 30, 1996, "the date of the *original* delivery ... to a consumer." *Id.* § 322G.2(8) (emphasis added). We find nothing in chapter 322G that provides for a new or different lemon law rights period when the vehicle is subsequently sold.[4] Therefore, the days on which Cato's car was in for repairs during the lease period are included in determining the cumulative days the vehicle was out of service.

Under this interpretation of the statute, we must reject Suzuki's argument that the evidence established as a matter of law that the vehicle was out of service less than thirty days. To the contrary, there was substantial undisputed evidence in the record to support a finding by the jury that the car was *not* out of service for less than thirty days, but rather had been in for repairs for fifty-four days by the time suit was filed. Therefore, the jury's negative answer to interrogatory no. 5 could be explained by a finding that the vehicle was not out of service for less than thirty days. Consequently, we adhere to our earlier conclusion that the jury's answers to the special interrogatories cannot support entry of judgment in favor of Suzuki.

### V. Did the District Court Err in Refusing to Grant Summary Judgment to Suzuki?

■ We must still consider Suzuki's claim that it was entitled to summary

judgment on the basis that it established as a matter of law that the nonconformity in Cato's vehicle had been repaired by Suzuki. We review the district court's denial of Suzuki's motion for summary judgment for correction of errors of law. *See Crippen v. City of Cedar Rapids,* 618 N.W.2d 562, 565 (Iowa 2000).

> If the record shows no genuine issue of a material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. In assessing whether summary judgment is warranted, we view the entire record in a light most favorable to the nonmoving party. We also indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question.

*Id.* (citations omitted).

Under chapter 322G, Cato was required to prove that her vehicle had a nonconformity—"a defect, malfunction, or condition ... such that the vehicle fail[ed] to conform to the warranty." Iowa Code § 322G.2(14) (defining "nonconformity"). She also had to prove that this defect, malfunction, or condition "substantially impair[ed]" the vehicle so as "to render [it] unfit, unreliable, or unsafe for warranted or ordinary use." *Id.* § 322G.2(20) (defining "substantially impair"). Suzuki claims that the undisputed facts show that the vehicle did not have a defect that rendered the vehicle unfit, unreliable or unsafe because the stalling problem in the vehicle had been fixed.

At the time of the summary judgment motion, the record showed the following, when viewed most favorably to Cato. Rhoden replaced the idle air control valve in October 1996 in an attempt to remedy the stalling problems experienced by Cato since her purchase of the vehicle in May 1996. The car then performed relatively

---

4. We also note that Cato remained a "consumer" upon her purchase of the vehicle because she was a "person entitled by the terms of the warranty to enforce the obligations of the warranty during the lemon law rights period." *See* Iowa Code § 322G.2(3).

well the remainder of that winter, only to again have stalling problems when cold weather commenced in late 1997. Rhoden again replaced the idle air control valve in November 1997 and, according to Cato's deposition testimony in September 1998, she had had no further problems with the car stalling. Based on her past experience, however, in thinking the problem was corrected only to have it resurface, she testified that she did not know whether the stalling problem had actually been remedied.[5] We think that based on this record, a fact finder could conclude that replacing the valve was only a temporary solution, and did not resolve the stalling problem, which occurred only during cold weather.

Moreover, there was evidence in the record that, despite the second replacement of the air intake control valve, the car continued to run sluggishly, there was "incessant rattling" and noises in the steering column, and the interior dome light intermittently came on during left-hand turns. There was also evidence that this latter problem caused visual difficulties for Cato when it occurred after dark. In addition, Cato testified that she was afraid to drive the vehicle out of town based on its past problems and the continuing sluggishness and rattling. Even if the stalling problem had been fixed, a jury could have found that the other problems with the vehicle rendered it substantially impaired. We think the district court correctly held that Suzuki had not established as a matter of law that the nonconformities in the vehicle had been remedied so as to entitle it to summary judgment.

VI. *Summary and Disposition.*

We hold that Cato was required under section 322G.8(1) to prove that Suzuki had been given a final opportunity to fix the vehicle as provided in section 322G.4(1) as a prerequisite to filing suit. The court erred in failing to instruct the jury on this

requirement as requested by Suzuki. We reject Suzuki's contention that it was entitled to judgment based on the jury's answers to the special interrogatories. The jury did not clearly find that Suzuki had not been given a final opportunity to cure. Finally, we agree with the district court that the defendant was not entitled to summary judgment. A genuine issue of material fact existed as to whether Cato's car had a defect that substantially impaired the vehicle and had not been repaired by Suzuki or its authorized service agent.

Based on the court's instructional error, we reverse the judgment entered in Cato's favor and remand for a new trial. This ruling makes it unnecessary to consider Suzuki's challenge to the court's determination of damages.

**REVERSED AND REMANDED.**

---

5. In fact, there was evidence at trial in November 1998 that the stalling problem had started again with the commencement of cold weather in October 1998.